IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| *Plaintiff*, | : | Case No. 1:23-cr-17 |
| | : | |
| vs. | : | Judge Jeffery P. Hopkins |
| | : | |
| STEPHEN WHEELER (1), | : | |
| ROMELLO WHEELER (2), | : | |
| | : | |
| *Defendants.* | : | |

## OPINION & ORDER

Before the Court is a motion to suppress and request for an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), filed by Defendant Romello Wheeler (Doc. 55) (the "Motion"), which has been joined by his father Stephen Wheeler who is a co-defendant in this proceeding (Doc. 66). The Government opposes the Motion. Doc. 70. On January 10, 2024, the Court conducted a hearing on the Motion and the parties subsequently filed post-hearing briefs at the Court's direction. *See* Docs. 74, 75, 76. For the reasons detailed more fully below, the Motion is **GRANTED IN PART AND DENIED IN PART**.

### I.     BACKGROUND

After months of investigation and surveillance by DEA agents, Defendant Stephen Wheeler and his son Romello Wheeler (collectively, the "Wheeler Defendants"), along with Romello Wheeler's suspected girlfriend, Mikelle Hill, were indicted by a grand jury on charges of conspiring to distribute controlled substances. Doc. 15. All three defendants—the Wheeler Defendants and Defendant Mikelle Hill—are alleged to be part of a drug trafficking organization (the "Wheeler DTO"), which distributes fentanyl, methamphetamine, cocaine,

and marijuana in and around Cincinnati, Ohio. The Drug Enforcement Agency ("DEA")

began investigating the Wheeler Defendants in July 2022 after an anonymous tipster reported

to the Ohio Department of Rehabilitation and Correction Adult Parole Authority ("ODRC

APA") that the Wheeler Defendants were trafficking narcotics.

After the long investigation into the Wheeler Defendants' activities came to a head,

DEA agents sought and executed several search warrants. The Wheeler Defendants now seek

to suppress evidence recovered as a result of those searches, including

1. February 3, 2023, warrantless traffic stop and warrantless search of the
   BMW 740 in Georgia (the "Georgia Stop");

2. February 7, 2023, search of Public Storage Unit # 2261, 2900 Disney
   Street, Cincinnati, Ohio 45209 (the "Storage Unit");

3. February 7, 2023, search of apartment # 1101, 2515 Burnet Avenue,
   Cincinnati, Ohio 45219 (the "Burnet Apartment")

4. February 7, 2023, search of apartment # 626, 1118 Sycamore Steet,
   Cincinnati, Ohio 45202 (the "Sycamore Apartment"); and,

5. February 7, 2023, warrantless traffic stop, arrest, and search of Romello
   Wheeler in Cincinnati, Ohio (the "Cincinnati Stop").

*See* Docs. 55, 66. Stephen Wheeler also seeks to suppress statements he made while

temporarily detained and during a post-arrest interview on February 7, 2023.

The following dates and events are of particular relevance to the present Motion:

**A. January 31 and February 1, 2023**

On January 31, 2023, DEA agents investigating the Wheeler Defendants obtained a

search warrant authorizing the installation of a GPS tracker on a black 2023 BMW. Doc. 70-

1, ¶ 33–34. Agents knew from the investigation that Stephen Wheeler was the primary driver

of the black BMW. *Id.* After obtaining the warrant, on February 1, 2023, DEA agents went

to the Sycamore Apartment to install the tracker on the BMW and while there "observed an

illegally parked white Mitsubishi" with heavily tinted windows. *Id.*, ¶ 34; Doc. 70-2, ¶ 17. BMV records revealed that Mitsubishi was registered to Mikelle Hill, the suspected girlfriend of Romello Wheeler. Doc. 70-1, ¶ 34. Because of poor visibility, agents could not identify any vehicle occupants during the surveillance at the Sycamore Apartment on February 1, 2023.

### B.  February 2, 2023

The following day, on February 2, 2023, agents observed Stephen Wheeler leave the Sycamore Apartment in a GMC Denali and then drive directly to the Burnet Apartment. *Id.*, ¶ 36. A short time later, the Mitsubishi arrived at the Burnet Apartment, escorting Antoine Pauyo, the Wheeler Defendants' suspected source of supply, who was driving the black BMW. *Id.* After waiting outside of the Burnet Apartment for the occupants to emerge, agents later observed the Mitsubishi and its driver exit the parking garage, drive to Public Storage (a storage unit facility), and then enter one of the storage units before leaving the facility approximately ten minutes later, driving evasively. *Id.*

Central to the dispute in this proceeding is the identity of the Mitsubishi's driver. DEA Task Force Officer Kenneth Baker ("DEA Officer Baker") served as the affiant for the Storage Unit Affidavit (Doc. 70-2). Key to the investigation, DEA Officer Baker identified Romello Wheeler as the Mitsubishi's driver on February 2, 2023. However, several weeks after the search warrants were executed, video surveillance from the Burnet Apartment revealed that Mikelle Hill, not Romello Wheeler, had actually been driving the Mitsubishi on February 2.

### C.  February 3, 2023

The next day, on February 3, 2023, agents subpoenaed records from Public Storage. Those records revealed that beginning in November of 2022, Mikelle Hill had rented the Storage Unit at that facility. *Id.*, ¶ 37.

On the same day that the Storage Unit records were subpoenaed, February 3, 2023, agents began tracking the black BMW traveling southbound on interstate 75 using the GPS tracker installed two days before. *Id.*, ¶ 39. At the time, agents believed that Romello Wheeler and Antoine Pauyo were headed to Atlanta possibly transporting drug proceeds. *Id.* Acting on that information, agents contacted the Bartow County, Georgia Sheriff's Office via DEA Atlanta and reported that the BMW was headed toward Georgia. Agents also informed the Bartow County Sheriff's Office of the nature of the DEA's investigation. Subsequently, Bartow County Sheriff's Deputy Tucker Robinson initiated a traffic stop of the BMW. Romello Wheeler was driving the BMW and travelling with him was Antoine Pauyo, and an unidentified female. *Id.*, ¶ 40. After stopping the BMW, Deputy Sheriff Robinson, a certified K-9 handler, deployed his narcotic detection dog, Cairo, who positively alerted to the presence of drugs inside the BMW. *Id.* Upon searching the BMW, officers recovered 19 grams of marijuana, $5,000 in currency under the front seat, and a suitcase with roughly $50,000 in currency in the trunk. *Id.*

### D. February 7, 2023

Further into the investigation, on February 7, 2023, agents conducted an open-air sniff test at Public Storage with the consent of management. *Id.*, ¶ 41. DEA Task Force Officer Corey Bonner of the Cincinnati Police Department and his trained narcotics detection K-9, Deuce, conducted the test. *Id.* During that test, Deuce alerted positively to the presence or odor of narcotics outside of the Storage Unit. *Id.*

Later that same day, agents obtained a search warrant for the Storage Unit from Hamilton County Municipal Court Judge Heather Russell. Doc. 70-2. When executing the search, agents recovered "a distinctive blue suitcase containing. . . 1,317.9 grams of fentanyl,

4

1,678.3 grams of 95% pure crystal methamphetamine (or "Ice"), and 819 grams of cocaine." Doc. 70, PageID 254.

After searching the Storage Unit, on February 7, 2023, agents also obtained search warrants from United States Chief Magistrate Judge Karen L. Litkovitz for the Sycamore and Burnet Apartments and three other vehicles including: a Ford F-150, GMC Denali, and Kia Stinger. Doc. 70-1. In support of those search warrants, DEA Task Force Officer Eric Persing submitted the "Global Affidavit," *see* Doc. 70-1, that provided the same statements relating to Romello Wheeler as the driver of the white Mitsubishi on February 2 as had been set forth by DEA Officer Baker in the Storage Unit Affidavit. The Global Affidavit also described the items that agents had seized from the Storage Unit earlier that day. *Id.*, ¶ 42.

While awaiting execution of the search warrants, agents began surveillance on the Burnet and Sycamore Apartments. During that time, agents observed a Dodge Ram truck leave the Sycamore Apartment and drive toward the Burnet Apartment. After the Dodge Ram ran a red light, agents initiated a traffic stop. The driver of the Dodge Ram truck, Romello Wheeler, was temporarily detained pending execution of the search warrants on the Burnet and Sycamore Apartments. During the stop, one of the K-9's with the officers alerted to narcotics and a search of the vehicle uncovered one pound of marijuana and cell phones. Doc. 70, PageID 254. Meanwhile, agents positioned in the garage at the Burnet Apartment observed Stephen Wheeler standing between the Kia Stinger and GMC Denali. According to agents, Stephen Wheeler got into the GMC Denali as they approached, but eventually surrendered and was also temporarily detained pending execution of the search warrants on the apartments. *Id.* at 254–55.

Inside the Burnet Apartment (later referred to as the Wheeler DTO "stash house"), agents recovered "cutting agents, multiple scales, a vacuum sealer, packaging material, and gloves." *Id.* at 255. From the Sycamore Apartment (Stephen Wheeler's primary residence), agents seized "212.6 pounds of marijuana, a loaded FN Herstal Belgium pistol, over $129,530 in bulk cash, $395,800 worth of assorted jewelry, personal papers, cell phones, and other documentation." *Id.* Agents also recovered "approximately 962.5 grams of lab-confirmed cocaine, $108,221 in bulk cash, and more high-end jewelry from Stephen Wheeler's Kia Stinger." *Id.*

The Wheeler Defendants were both arrested following execution of the search warrants at the Burnet and Sycamore Apartments.

## II.   LAW AND ANALYSIS

### A. The Wheeler Defendants are not entitled to a *Franks* hearing.

The Wheeler Defendants challenge the veracity of statements contained in the search warrant affidavits. Because their arguments rise and fall with their challenge to the Storage Unit Affidavit and subsequent search, the Court will first focus its efforts there.

"An affidavit supporting a search warrant is presumed valid." *United States v. Fountain*, 643 F. App'x 543, 545 (6th Cir. 2016) (citing *Franks*, 438 U.S. at 171). Accordingly, a defendant is entitled to an evidentiary hearing on the veracity of a warrant affidavit—a "*Franks* hearing"—only if the defendant (1) "makes a substantial preliminary showing that the affiant knowingly and intentionally, or with reckless disregard for the truth, included a false statement [] in the affidavit" and (2) "proves that the false statement [] is necessary to the probable cause finding in the affidavit." *United States v. Rose*, 714 F.3d 362, 370 (6th Cir. 2013) (citing *Franks*, 438 U.S. at 171–72); *United States v. Bateman*, 945 F.3d 997, 1008 (6th

6

Cir. 2019). Only when the defendant makes his preliminary showing does the Court then need to assess whether probable cause exists if the false statement is excluded. *See United States v. Atkin*, 107 F.3d 1213, 1217 (6th Cir. 1997).

The defendant's burden in making this "substantial preliminary showing" is a heavy one. *Bateman*, 945 F.3d at 1008. The defendant's challenge

> must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained.

*Franks*, 438 U.S. at 171. Merely proving a falsity is not enough—the defendant must show the affiant *intended* the statement to be false or misleading. *See United States v. Schimley*, No. 1:08 CR 510, 2009 WL 5171826, at *6 (N.D. Ohio Dec. 21, 2009) ("*Franks* teaches that a mere showing of falsity is insufficient to demonstrate recklessness on the part of the affiant[.]"), *aff'd*, 467 F. App'x 482 (6th Cir. 2012). Ultimately, the decision of whether to hold a *Franks* hearing is "committed to the sound discretion of the district court." *Bateman*, 945 F.3d at 1008 (quoting *United States v. Young*, 847 F.3d 328, 348 (6th Cir. 2017)).

### 1. Storage Unit Affidavit

The Wheeler Defendants contend that DEA Officer Baker made intentional or recklessly false statements when he averred that Romello Wheeler was driving the Mitsubishi on February 2, 2023, and was the individual observed accessing the Storage Unit on that date. Relevant parts of the Storage Unit Affidavit read as follows:

> On February 1, 2023, the affiant was at WHEELER's apartment building located at 1118 Sycamore Street, attempting to install a

lawfully obtained GPS tracker on WHEELER's Kia pursuant to a warrant signed by The Honorable Judge Jody Luebbers of the Hamilton County Court of Common Pleas. Agents observed a white Mitsubishi parked illegally in the parking structure bearing Ohio License Plate JSH4585. This vehicle is registered to Mikelle Hill (Romello Wheeler's girlfriend) at 156 Nansen Street, Cincinnati, Ohio 45216. Agents were unable to identify any occupants inside the vehicle but suspect that it is operated by Romello WHEELER, whom agents have observed conducting suspected drug deals from a Ford F-150 that is also registered to Hill.

[On February 2, 2023] Stephen Wheeler departed his apartment on Sycamore and drove to the suspected stash apartment located at Burnett Avenue. Shortly after Romello WHEELER arrived in the Mitsubishi escorting PAUYO (who was operating Stephen WHEELER's new BMW). Romello WHEELER utilized the key fob and both vehicles drove into the parking garage. After a short period of time, Romello WHEELER exited the garage driving the Mitsubishi. Agents followed the Mitsubishi to a storage unit in Oakley. Agents were not able to observe which unit he accessed. After approximately 10 minutes, Romello WHEELER departed the storage unit in the Mitsubishi and began driving evasively. This is a common practice that drug traffickers do in order to avoid law enforcement detection. Agents discontinued their surveillance in fear of alerting Romello WHEELER of law enforcement.

On February 3, 2023, a subpoena was issued to Public Storage located at 2900 Disney Street, Cincinnati, Ohio. According to their records, Mikelle Hill rented unit # 2261 (i.e., the Target Storage Unit) starting in November 2022. Mikelle Hill is Romello WHEELER's girlfriend and the same individual that the WHEELER DTO uses to register other vehicles, including the Ford F-150 and Kia. Moreover, records for the Target Storage Unit showed that Romello WHEELER entered the Target Storage Unit facility the day prior driving in the Mitsubishi, precisely as witnessed by agents.

Storage Unit Affidavit, Doc. 70-2, PageID 310–11. However, weeks after the search warrant was executed and agents obtained surveillance footage from the Burnet Apartment, the video showed that co-defendant Mikelle Hill, not Romello Wheeler, had been the one observed operating the Mitsubishi on February 2, 2023. The Wheeler Defendants thus contend that

8

statements contained in the affidavit were not only false but were also made with the intent to mislead in order to create a sufficient nexus between them and the Storage Unit. Not surprisingly, the Government takes an opposite view. The Government argues that the misidentification of the Mitsubishi driver that occurred in this case on February 2 was a plausible mistake and further argues that *United States v. Purifoy*, 396 F. App'x 202 (6th Cir. 2010), a case in which the Sixth Circuit held that "[a] *reasonable* misidentification cannot be made 'recklessly' and a mistake cannot be made 'knowingly,'" controls. The Court agrees.

The Wheeler Defendants attempt to distinguish *Purifoy* from the facts here by arguing that Romello Wheeler and Mikelle Hill do not bear any resemblance and the two are of a different gender. In *Purifoy*, the affiant confused an individual named David Arafat, a black male, with the drug courier, Edward Frowner, another black male. *Purifoy*, 396 F. App'x 206–07. Here, Mikelle Hill, a black female, was allegedly mistaken for her boyfriend, Romello Wheeler, a black male. Though Mikelle Hill and Romello Wheeler vary greatly in size, the same was true in *Purifoy*. The affiant testified that Arafat, the individual that the affiant observed, "was of a significantly larger build" than Frowner. *Id.* at 207. And in this case, unlike in *Purifoy*, DEA Officer Baker did not have an opportunity to view the Mitsubishi's driver standing outside of the vehicle. Further, it is not in dispute that DEA Officer Baker based his identification on a restricted view of the Mitsubishi's driver through the car's heavily tinted windows. At the time he observed the driver, DEA Officer Baker was positioned across the street in an adjacent parking lot, roughly 80 yards away. Moreover, he was using binoculars to help identify the driver through the tinted windows. Doc. 70, PageID 252.

These circumstances render a mistaken misidentification all the more plausible when considering co-defendant Mikelle Hill and Romello Wheeler's known physical appearances

at the time. Prior to viewing the video surveillance, agents had yet to observe Mikelle Hill in person and only had access to her BMV photo. Hill's BMV photo depicted her with short, cropped hair—rather than the long-braided hair later observed on video surveillance. Doc. 70, PageID 262. Coupled with the fact that Romello Wheeler wore his hair braided, one could easily see how on February 2, 2023, DEA Officer Baker might have confused Mikelle Hill for Romello Wheeler when he could only observe the Mitsubishi driver's head and shoulders seated behind the wheel of a moving vehicle through heavily tinted car windows. In this Court's view, the case at bar presents a classic example of "[a] reasonable misidentification," which falls well short of *Franks* standard that requires "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." *Franks v. Delaware*, 438 U.S. at 155–56.

The Wheeler Defendants also argue that DEA Officer Baker recklessly disregarded other information that should have given him pause in making the identification. However, an affiant's statement "is only considered to be issued with 'reckless disregard for the truth' if a defendant shows that the affiant subjectively 'entertain[ed] serious doubts as to the truth of his [or her] allegations.'" *United States v. Bateman*, 945 F.3d 997, 1008 (6th Cir. 2019) (quoting *United States v. Cican*, 63 F. App'x 832, 836 (6th Cir. 2003)). Here, the Wheeler Defendants have made no such showing. Aside from there being no evidence that agents entertained any doubts, let alone serious ones, about the averments in the affidavit until corrected by the video, other information uncovered during the investigation and known to agents at the time of the misidentification clearly supported DEA Officer Baker's belief that Romello Wheeler was driving the Mitsubishi on February 2, 2023.

10

Aligned with DEA Officer Baker's training and experience, the Wheeler Defendants were well known to operate multiple vehicles registered to other persons, most frequently co-defendant Mikelle Hill.[1] Doc. 70-2, PageID 307. According to DEA Officer Baker this is a common tactic used by drug traffickers to avoid detection by law enforcement. *Id.* Romello Wheeler, for example, was known to operate a Ford F-150 registered to Mikelle Hill and was suspected by agents of conducting drug deals in that vehicle. *Id.* at PageID 310. Stephen Wheeler had also been seen driving the same Ford F-150. *Id.* at PageID 306. Law enforcement had also observed the Ford F-150 parked at both the Sycamore Apartment, the alleged primary residence of Stephen Wheeler, and the Burnet Apartment, the alleged stash house for the Wheeler DTO. *Id.* at PageID 306, 309.

The day before misidentifying Romello Wheeler as Mikelle Hill, DEA agents observed the white Mitsubishi registered to Hill parked illegally at the Sycamore Apartment. And even though "[a]gents were unable to identify any occupants inside the vehicle," they "suspect[ed] that it [was] operated by Romello WHEELER, whom agent [*sic*] have observed conducting suspected drug deals from a Ford F-150 that is also registered to Hill." *Id.* at PageID 310. Romello Wheeler highlights in his post-hearing brief that he was not identified as a resident of the Sycamore Apartment, and that Mikelle Hill had not been seen or associated with any targeted residence. Doc. 74, PageID 1098. Rather than showing falsity or demonstrating recklessness on the part of the affiant, these facts give more credence to DEA Officer Baker's belief that Romello Wheeler—not Mikelle Hill—had been operating the Mitsubishi when it

---

[1] Management at the Sycamore Apartment confirmed that Stephen Wheeler was "utilizing several different vehicles and [was] constantly changing the vehicles he [was] driving." Doc. 70-2, PageID 309. One of those was a BMW registered to Brittany Lancaster, a suspected straw purchaser for the Wheeler Defendants' vehicles. *Id*. at PageID 310. A "tipster" also advised that Stephen Wheeler utilized several vehicles registered to Barbara Simms to transport narcotics. *Id.* at PageID 307.

11

was parked at the Sycamore Apartment on February 1, 2023, and when the Mitsubishi was seen the very next day, February 2, 2023, (1) arriving at the Burnet Apartment escorting known associate and suspected drug supplier, Antoine Pauyo, who was operating Stephen Wheeler's BMW, and (2) departing for the Storage Unit.

Nothing in the record suggests that the relevant portions of the affidavit that misidentify the driver of the white Mitsubishi were deliberately or recklessly false. The evidence all points to the agents making a reasonable mistake about who was driving a vehicle that had become a focus of their investigation based on the surrounding facts. Because "[a] reasonable misidentification cannot be made 'recklessly' and a mistake cannot be made 'knowingly,'" *Purifoy*, 396 F. App'x at 209, the Wheeler Defendants have failed to satisfy the first part of the two-part inquiry under *Franks*.

Suppose on the other hand that the DEA agents had suspected that Mikelle Hill, not Romello Wheeler, was driving the white Mitsubishi from the Burnet Apartment to the Storage Unit on February 2. Would the agents have acted any differently? The answer is clearly, no. Even if the Wheeler Defendants had made a substantial preliminary showing that DEA Officer Baker made an intentional or recklessly false statement, they have not shown that removing the mistaken identification from the affidavit would have materially impacted the probable cause assessment. Probable cause "requires only a probability or substantial chance of criminal activity." *United States v. Tagg*, 886 F.3d 579, 585 (6th Cir. 2018) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018)). This is not a high bar to clear.

The evidence in this case supports a finding of probable cause for the search of the Storage Unit by the reviewing judge even if Romello Wheeler's name were excised from the affidavit as the driver of the Mitsubishi and were replaced with that of Mikelle Hill or perhaps

another unidentified co-conspirator. Over the course of a seven to eight-month investigation, agents observed the Wheeler Defendants engage in conduct consistent with drug trafficking,[2] using another vehicle registered to Mikelle Hill, the Ford F-150, that Romello Wheeler was suspected to deal drugs from. Doc. 70-2, PageID 306–309. When agents saw the white Mitsubishi at the Sycamore Apartment on February 1, 2023, and again on February 2, 2023, at the Burnet Apartment and discovered that it was also registered to Mikelle Hill, they had every reason to suspect that it was being used for criminal activities. Naturally, this information would have led agents to follow the Mitsubishi when it drove straight from the Burnet Apartment, the Wheeler Defendants' alleged stash house, to the Storage Unit, where the driver entered one of the storage units and departed ten minutes later driving evasively.

DEA Officer Baker understood based on his knowledge and experience that rented storage units are commonly used to conceal evidence by drug traffickers and that drug traffickers often place their property in other individual's names to avoid detection by law enforcement. Doc. 70-2, PageID 304–05. And, as set forth in the affidavit, a K-9 lawfully conducted an open-air sniff with the consent of Public Storage's management and alerted positively to the presence of narcotics outside the Storage Unit rented by co-defendant Mikelle Hill.[3] *Id*. at PageID 312; Doc. 70-1, PageID 293. Considering all of the foregoing, the Court

---

[2]  DEA Officer Baker explained in the affidavit that Stephen Wheeler has a previous federal drug trafficking conviction, and many of the behaviors that agents observed during the present investigation were the same behaviors that agents observed when investigating Stephen Wheeler's previous drug trafficking activity. For example, DEA Officer Baker explained that "utilizing motor vehicles to transport a backpack of contraband and utilizing high end apartment building [*sic*] as meet or stash locations is consistent with [Stephen Wheeler's] previous methods of trafficking narcotics." Doc. 70-2, PageID 307.

[3]  An open-air sniff is not a "search" within the meaning of the Fourth Amendment, and therefore would be constitutional even in the absence of any other evidence supporting probable cause. *United States v. Reed*, 141 F.3d 644, 650 (6th Cir. 1998) (when a canine team is lawfully present at the location where the sniff occurs, "a canine sniff is not a search within the meaning of the Fourth Amendment.") (citing *United States v. Diaz*, 25 F.3d 392, 397 (6th Cir. 1994)); *see also United States v. Cook*, No. 89-5947, 1990 WL 70703, at *2 (6th Cir. May 29,

finds that the affidavit establishes a sufficient nexus between the Storage Unit and the Wheeler DTO's drug trafficking activities that would have allowed the reviewing judge to infer that the Storage Unit rented by Mikelle Hill was being used by the Wheeler Defendants to hide drugs and drug proceeds. *United States v. Elbe*, 774 F.3d 885, 889–90 (6th Cir. 2014) (The nexus between the place to be searched and the evidence sought "can be inferred from 'the type of crime being investigated, the nature of things to be seized, the extent of an opportunity to conceal the evidence elsewhere and the normal inferences that may be drawn as to likely hiding places.'") (quoting *United States v. Williams*, 544 F.3d 683, 687 (6th Cir. 2008)).

For these reasons, the Wheeler Defendants have not made a substantial preliminary showing that DEA Officer Baker made *intentional* or *recklessly* false statements in the Storage Unit Affidavit, nor that the false statements were material to a finding of probable cause. The Wheeler Defendants are therefore not entitled to a *Franks* hearing.

### B. The Wheeler Defendants have not shown that the information in the search warrant affidavits was stale.

In a final effort to get the search warrants tossed, the Wheeler Defendants argue that the information in the affidavit was "stale" and cannot be used to establish probable cause. Whether information is stale in the context of a warrant depends on a number of factors:

> (1) the character of the crime (chance encounter in the night or regenerating conspiracy?),
>
> (2) the criminal (nomadic or entrenched?),
>
> (3) the thing to be seized (perishable and easily transferrable or of enduring utility to its holder?), and
>
> (4) the place to be searched (mere criminal forum of convenience or secure operational base?).

---

1990) (unpublished) ("We hold that a person's expectation of privacy does not extend to the areaway outside a rented storage locker in a public facility.").

*United States v. Frechette*, 583 F.3d 374, 378 (6th Cir. 2009) (quoting *United States v. Abboud*, 438 F.3d 554, 572–73 (6th Cir. 2006)). Because probable cause is concerned with the present, "the critical question is whether the information contained in the affidavit, when presented to the . . . judge, established that there was a fair probability that [evidence] would still be found at [the location of the search]." *Abboud*, 438 F.3d at 572 (quoting *United States v. Spikes*, 158 F.3d 913, 923 (6th Cir. 1998)) (alterations in original).

The investigation here spanned from July 2022 to February 2023—just over six months. The Wheeler Defendants say that because there were periods of stagnancy, primarily after October 2022, the observations that occurred between July 2022 and October 2022 are stale and insufficient to establish a fair probability that evidence of a crime would be located at the targeted locations.

The Court disagrees. Taken together, the factors identified by the Sixth Circuit in *Frechette* all militate against a finding of staleness. First, where the evidence concerns a long-term criminal operation, such as the drug conspiracy at issue, greater lapses of time between the information relied on and the request for a search warrant are permissible. *United States v. Thomas*, 605 F.3d 300, 310 (6th Cir. 2010); *see United States v. Sinclair*, 631 F. App'x 344, 348 (6th Cir. 2015) (drug trafficking is typically considered to be an ongoing offense, which weighs against staleness); *see also United States v. Ombisi*, No. 221CR20011MSNCGC, 2022 WL 3701176, at *5 (W.D. Tenn. Aug. 26, 2022) ("[T]he nature of the crime is an ongoing narcotics distribution conspiracy that renders the passage of time less significant.") (quotations omitted). Second, the ongoing nature of the criminal activity described in the affidavit suggests that the Wheeler Defendants were "entrenched" in the Cincinnati area rather than "nomadic." Although the third factor favors staleness since "drugs are usually

15

sold and consumed in a prompt fashion," *see Frechette*, 583 F.3d at 378, the fourth factor does not. Agents observed the Wheeler Defendants at the Sycamore and Burnet Apartments on multiple occasions from July 2022 through February 2023, which more closely aligns with those locations being "secure operational bases" as opposed to "mere criminal forums of convenience." *Sinclair*, 631 F. App'x at 348 ("Finally, because officers observed Sinclair at Snowden on four separate occasions over the course of a year-long investigation, and observed him using a key to gain entry, the Snowden address is closer to a 'secure operational base' rather than a 'mere criminal forum of convenience.'"). Additionally, agents had only become aware of the Storage Unit and its link to possible criminal activities just days before seeking that search warrant. As such there was more than a fair probability that evidence of recent narcotics trafficking might be discovered there.

Finally, as the Sixth Circuit has aptly observed, "where recent information corroborates otherwise stale information, probable cause may be found." *United States v. Spikes*, 158 F.3d at 924 (citing *United States v. Henson*, 848 F.2d 1374, 1381–82 (6th Cir. 1988)). So even if some aspects of the affidavits were "stale," the more recent events refresh any otherwise stale information. The Wheeler Defendants are thus not entitled to suppression of evidence seized as a result any of the search warrants executed in this case.

### C. The Wheeler Defendants[4] are not entitled to suppression of evidence seized during the February 3, 2023 traffic stop in Georgia.

The Wheeler Defendants contend that all evidence seized as a result of the traffic stop and warrantless search February 3, 2023, must be suppressed because the stop was unlawfully extended, and the K-9 did not properly alert to the presence of controlled substances.

#### 1. Initial Traffic Stop

When an officer "has probable cause to believe that a driver has violated traffic law, the officer may stop the driver without running afoul of the Fourth Amendment; this is true even if the officer is *actually* motived by some other purpose, such as investigating an unrelated crime." *United States v. Shelton*, 817 F. App'x 217, 219 (6th Cir. 2020) (citing *Whren v. United States*, 517 U.S. 806, 810 (1996)). As here, however, when there is an "ongoing" traffic violation such as the vehicle having illegally tinted windows, "the less demanding 'reasonable suspicion' standard applies." *Id.* (citing *United States v. Simpson*, 520 F.3d 531, 541 (6th Cir. 2008)).

"An officer reasonably suspects a window-tint violation if the officer is familiar with their state's tint law and estimates that a vehicle is tinted substantially darker than that law permits." *Id.* (quoting *United States v. Shank*, 543 F.3d 309, 313 (6th Cir. 2008)) (cleaned up). At the hearing, Deputy Sheriff Robinson testified that he observed a window-tint violation on the black 2023 BMW. Hearing Tr., Doc. 71-1, 53:20–23. He added that he has been involved with "several hundred" traffic stops, around two hundred of which have involved window tint violations, and that he was familiar with Georgia's law on legal window tints. *Id.* at 48:18–

---

[4]    The Government contends that Stephen Wheeler lacks standing to challenge the stop and warrantless search that occurred in Georgia. The Court need not reach the issue of standing because, even assuming that standing has been established as to Stephen Wheeler, the Wheeler Defendants are not entitled to suppression of evidence for the Georgia stop and search.

49:2. Importantly, he testified that the window tint on the BMW was so dark that he could not even see how many occupants were inside or that there was a passenger seated in the backseat when he approached the vehicle after the stop. *Id.* at 57:17–21. Accordingly, Deputy Sheriff Robinson had "reasonable suspicion" of an ongoing traffic violation, and therefore complied with the Fourth Amendment when he stopped the BMW.[5]

### 2. Duration of the Stop

Whether the duration of the traffic stop was lawfully extended is a closer call. The Government contends that the stop was not prolonged because the dog sniff occurred while Deputy Sheriff Robinson was completing tasks related to the traffic violation.

The duration of a traffic stop is "tightly tethered to the mission of the traffic stop." *United States v. Lott*, 954 F.3d 919, 923 (6th Cir. 2020) (citing *Rodriguez v. United States*, 575 U.S. 348, 355 (2015)). "Beyond determining whether to issue a ticket, an officer's mission includes ordinary inquiries incident to the traffic stop," such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez*, 575 U.S. at 355 (quoting *Illinois v. Caballes*, 543 U.S. 405, 408 (2005)) (cleaned up). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.*

A traffic stop may be extended, however, if "something happened *during the stop* to cause the officer to have a reasonable and articulable suspicion that criminal activity is afoot." *Lott*, 954 F.3d at 923 (quoting *United States v. Stepp*, 680 F.3d 651, 661 (6th Cir. 2012)). And, although a dog sniff may not be "a task incident to ordinary traffic stops," a traffic stop may

---

[5] Stephen Wheeler focuses on Deputy Robinson's reference to a "whisper stop." Regardless of the terminology that Deputy Robinson used, he had reasonable suspicion for the stop in Georgia on February 3, 2023.

still be extended to accommodate a dog sniff when an officer has reasonable suspicion of criminal activity. *United States v. Salas*, 820 F. App'x 405, 411 (6th Cir. 2020).

Clearly, on the record now before the Court, Deputy Sheriff Robinson had reasonable suspicion of criminal activity sufficient to prolong the stop and engage Cairo in a dog sniff. He testified that he observed nervous behavior, such as trembling and shaking hands when Romello Wheeler tendered his driver's license. Hearing Tr., Doc. 71-1, 93:11–22. *See United States v. Pacheco*, 841 F.3d 384, 393 (6th Cir. 2016) (nervousness alone is insufficient for reasonable suspicion but remains a relevant factor to consider). He also reported that the vehicle's occupants were behaving deceitfully. The occupants were unable to answer basic questions in a normal manner, like how the male passenger, an Atlanta resident, travelled to Ohio, the duration and purpose of his stay, and how all the occupants knew each other. *Id.* at 127:20–23. Deputy Sheriff Robinson was especially perplexed by the fact that Romello Wheeler did not know the female occupant's last name even though he claimed that she had been "his girl" for several months. *Id.* at 121:21–122:4, 127:24–128:6.

When viewed in a vacuum, Deputy Robinson's observations do not rise to above "an ill-defined hunch," but when considering those observations amidst the other information he had received about the investigation into the Wheeler Defendants and their potential involvement in a drug trafficking conspiracy, there was a "particularized and objective basis for suspecting" criminal activity. *Shank*, 543 F.3d at 313.

Similar circumstances were before the Sixth Circuit in *Salas*, where an officer initiated a traffic stop after observing a traffic violation. *Salas*, 820 F. App'x at 407. Much like this case, the officer in *Salas* had been following the vehicle because he had reason to believe that the occupants were transporting illegal drugs. The defendant argued that the stop had been

19

unlawfully prolonged for a dog sniff, but the Sixth Circuit agreed with the district court that the officer had reasonable suspicion to prolong the stop. Specifically, the Sixth Circuit observed that the stop was not a "simple routine traffic stop" and that it instead "arose out of an extensive investigation into an ongoing drug enterprise." *Id.* at 412. The officer therefore "had reason to suspect criminal activity even before the stop occurred." *Id.*

Stephen Wheeler contends that the facts in *Salas* are distinguishable from the facts here because *Salas* involved a confidential informant who had tendered "real-time information" which provided "probable cause to believe that evidence of criminal activity would be found in the search of the vehicle." Doc. 75, PageID 1118. The Court finds Stephen Wheeler's argument unpersuasive. Deputy Sheriff Robinson had been advised on the day of the stop that a vehicle traveling into his county was involved in a DEA drug investigation and that the vehicle "was believed or suspected" to be transporting drugs or money.[6][7] Hearing Tr., Doc. 71-1, 49:18–49:1, 78:1–15; *see Dorsey v. Barber*, 517 F.3d 389, 397 (6th Cir. 2008) ("[It] is important to note that the officer's reasonable suspicion need not arise exclusively from his own direct observations. Rather, it can be derived from such sources as informant tips, dispatch information, and directions from other officers.").

---

[6]   DEA Cincinnati had notified DEA Atlanta, which in turn, notified the Bartow County Sheriff's Office. Doc. 71-1, 49:18–49:1, 78:1–15

[7]   The vehicle was known to be traveling into Georgia because a GPS tracker had been installed on the BMW. Doc. 70-1, ¶ 39. TFO Baker articulated in the Global Affidavit that agents had believed from the outset of the investigation that the Wheeler DTO's suspected primary source of supply was from the Atlanta, Georgia area. *Id.*, ¶ 35. The day prior to the stop, agents had observed whom they believed to be Romello Wheeler drive to the Storage Unit. *Id.*, ¶ 36. And it was believed that he may have retrieved drug proceeds from the Storage Unit and then was transporting those proceeds when the GPS tracker showed that the BMW was traveling towards Georgia the following day. *Id.*, ¶ 38–39.

While Deputy Sheriff Robinson's observations during the stop "might not on their own provide reasonable suspicion to conduct a dog sniff, when added to the information obtained before the stop, the known facts clear that hurdle." *Salas*, 820 F. App'x at 413.

### 3. The Dog Sniff

Police have probable cause to search a vehicle when a well-trained dog alerts to the presence of contraband in a vehicle. *United States v. Betts*, 806 F. App'x 426, 430 (6th Cir. 2020). The Supreme Court has said that "[e]vidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert." *Florida v. Harris*, 568 U.S. 237, 246 (2013). When a defendant challenges a dog's reliability, the court must consider "whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime. A sniff is up to snuff when it meets that test." *Id.* at 248.

Here, the Wheeler Defendants challenge the reliability of Cairo's alert to the presence of narcotics in the BMW because Cairo exhibited trained and untrained behavior during the dog sniff. As a result, they argue there was not probable cause to search the BMW.

As an initial matter, the Government submitted evidence showing that Deputy Sheriff Robinson and Cairo successfully completed accreditation programs in February and March 2021. Gov. Ex. 1. In February 2021, the pair also completed a narcotic detection team accreditation for marijuana, cocaine, heroin, and methamphetamine. For that accreditation, Deputy Sheriff Robinson and Cairo satisfactorily completed vehicle search, building search, and locker search tests. They received accreditation again in October 2022, after successful vehicle search, building search, locker search, and open area search tests. The same was true

21

in October 2023. There was only one instance, in March 2021, where Cairo failed an "obedience" test after he "inched on distance control."

Deputy Sheriff Robinson testified that Cairo displays a trained response when he alerts positively to the presence of narcotics. Hearing Tr., Doc. 71-1, 47:2–20. That trained response for Cairo is "either a sit or a down depending on the location of the hide." *Id.* In addition to a trained response, Deputy Robinson testified that Cairo has untrained characteristics that he may also exhibit. *Id.* at 48:4–17. During the stop in Georgia, Cairo exhibited a final trained "sit" response along with untrained behavior (*i.e.*, climbing on the window of the BMW and attempting to jump into the window). *Id.* at 63:1–7. The Wheeler Defendants argue that this untrained behavior deemed Cairo's final trained response unreliable. Yet, Deputy Robinson testified that Cairo often exhibits that type of untrained behavior during traffic stops because he is "trained to go to the source of the odor." Thus, the untrained behavior that Cairo exhibited was "him simply trying to get to the source of the odor" through the window that was left open. *Id.* at 63:2–7, 10–17. It is important to note, however, that Cairo ultimately gave a final trained response.

Here, the accreditation records establish Cairo's reliability in detecting drugs, including marijuana which was found in the vehicle during the search in this case. Viewing that history, alongside Deputy Robinson's testimony, the Court finds that the Wheeler Defendants have failed to show that Cairo's untrained behavior deemed his positive alert unreliable. Because the alert established probable cause, the warrantless search of the BMW was proper.

### D. Romello Wheeler is not entitled to suppression of evidence seized during the February 7, 2023, traffic stop in Cincinnati, Ohio.

Cursorily, Romello Wheeler also challenges the traffic stop and warrantless search that occurred on February 7, 2023, in Cincinnati, Ohio, the date of his arrest for the offenses charged in the indictment.

As articulated above, when an officer has probable cause to believe that a driver has violated a traffic law, such a running a red light, the officer may lawfully stop the driver. *Shelton*, 817 F. App'x at 219; *see also Gregory v. Burnett*, 577 F. App'x 512, 516 (6th Cir. 2014) ("Probable cause is required for an investigatory stop for completed misdemeanor traffic violations."). An officer may also initiate a traffic stop based on reasonable suspicion of an "ongoing" traffic violation such as an illegally tinted window. *Shelton*, 817 F. App'x at 219.

At the hearing, DEA Special Agent Tyran Golden testified that officers from the Cincinnati Police Department initiated a traffic stop after Romello Wheeler ran a red light. Hearing Tr., Doc. 71-1, 144:1–6. Here again the windows of the Dodge Ram were heavily tinted. *Id.* Notably, Special Agent Golden likewise testified that the stop occurred while agents were preparing to execute search warrants for the Sycamore Apartment, from which Romello Wheeler had just left, and the Burnet Apartment, which was believed to be his intended destination. *Id.* at 145:6–15; *United States v. Sheckles*, 996 F.3d 330, 343 (6th Cir. 2021) ("Given the broad scope of a permissible *Terry* stop, several courts have allowed officers to pull over individuals seen driving away from a residence when the officers have obtained (or are about to obtain) a search warrant for the residence."); *see generally Terry v. Ohio*, 392 U.S. 1 (1968). The February 7, 2023, traffic stop of Romello Wheeler in the Dodge Ram truck was therefore lawful.

23

The subsequent vehicle search was also proper. Romello Wheeler has not argued that the stop was unlawfully prolonged; regardless, officers had reasonable suspicion to extend the stop when considering Romello Wheeler's behavior at the onset of the stop amidst the other facts known to the officers, including the results of the search of the Storage Unit earlier that day and the anticipated search of the Burnet and Sycamore Apartments. *Id.* at 144:19–21; 146:6–13; *Sheckles*, 996 F.3d at 343–44. Officers had probable cause to search the Dodge Ram based on the positive K-9 alert during the subsequent dog sniff. *Id.* at 146:24–147:6.

### E. Stephen Wheeler is not entitled to suppression of any statements made while temporarily detained on February 7, 2023, but is entitled to suppression of statements made during the post-arrest interview.

When a defendant makes statements during custodial interrogation, the prosecution may not use those statements unless the defendant has been advised of certain rights, including his "right to remain silent, that anything he says can be used against him in a court of law, that he has a right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda v. Arizona*, 384 U.S. 436, 479 (1966). A defendant, however, may implicitly waive those rights, *United States v. Williams*, 998 F.3d 716, 736 (6th Cir. 2021), and courts may infer an implied waiver "from the actions or words of the person interrogated," *North Carolina v. Butler*, 441 U.S. 369, 373–76 (2009). Even still, any waiver must be made "voluntarily, knowingly, and intelligently." *Miranda*, 384 U.S. at 444.

#### 1. Temporary Detention

On February 7, Defendant Stephen Wheeler was temporarily detained at the Burnet Apartment parking garage while agents waited to execute search warrants at the Burnet and Sycamore Apartments and on the vehicles suspected of being involved in Defendants' drug

24

conspiracy. At the hearing, Special Agent Golden testified that he personally read Stephen Wheeler his *Miranda* rights in the parking garage. Hearing Tr., Doc. 71-1, 150:5–151:9. He testified that Stephen Wheeler understood his rights and did not ask for a lawyer. *Id.* Special Agent Golden only recalled asking Stephen Wheeler whether there were any occupants at the Burnet Apartment for the purpose of officer safety and to preserve any evidence at the apartment. *Id.*

Stephen Wheeler alleges that any statements made while he was temporarily detained must be suppressed because there is "no contemporaneous evidence that [he] was advised of his rights at the arrest site." Doc. 75, PageID 1118. However, an explicit waiver form is not required. *United States v. Miggins*, 302 F.3d 384, 397 (6th Cir. 2002) (a written waiver not required to prove that a defendant voluntarily waived his rights). Here again, Special Agent Golden testified that he read Stephen Wheeler his *Miranda* rights and that he understood them. Aside from confirming that there were no occupants at the Burnet Apartment, Stephen Wheeler has not identified which statements, if any, should be suppressed. Even if he had, he has not shown that Special Agent Golden violated his *Miranda* rights while they were positioned at the parking garage.

## 2. Post-Arrest Interview

At the start of his post-arrest interview, DEA Officer Baker[8] read Stephen Wheeler his *Miranda* rights. Gov. Ex. 4. Stephen Wheeler orally acknowledged that he understood his rights, executed a *Miranda* waiver, and engaged in preliminary questioning with officers, thereby initially waiving his *Miranda* rights. *United States v. Adams*, 583 F.3d 457, 467 (6th Cir.

---

[8] Special Agent Golden testified that TFO Baker was on the recording of Stephen Wheeler's post-arrest interview. Hearing Tr., Doc. 71-1, 160:16–19.

2009) ("[W]aiver may be clearly inferred…when a defendant, after being properly informed of his rights and indicating that he understands them, nevertheless does nothing to invoke those rights and speaks.") (quoting *United States v. Nichols*, 512 F.3d 789, 798–99 (6th Cir. 2009)).

However, later in the interview, Stephen Wheeler unambiguously asserted his right to counsel by stating: "What I am going to [*sic*] ask you is that, you know, you make sure I got my lawyer present for those type of questions." Gov. Ex. 4, 3:15. He also provided officers with the name of the attorney he intended to call. If a defendant "unambiguously" requests counsel at any time during an interview, questioning must cease "until a lawyer has been made available or the suspect himself reinitiates conversation." *Davis v. United States*, 512 U.S. 452, 458 (1994). That did not occur here. DEA Officer Baker continued to attempt to engage with Stephen Wheeler, in what charitably can be viewed as a means of enticing him into answering more questions. *See* Gov. Ex. 4, 5:18 ("Maybe we could try to keep Romello out of it or lessen the degree, you know what I mean, it's your boy."). Stephen Wheeler told him that he was "not open to any type of discussion on that right now," which further suggests that he wanted his attorney to be present. *Id.* These statements are clearly distinguishable from the cases that the Government cites. *See e.g.*, *Davis*, 512 U.S. at 459 ("Maybe I should talk to a lawyer"); *United States v. Mays*, 683 F. App'x 427, 433 (6th Cir. 2007) ("I really should have a lawyer, huh?"). Any statements made after Stephen Wheeler invoked that right must therefore be suppressed.

## III.    CONCLUSION

For these reasons, the Wheeler Defendants' Motion (Doc. 55, 66) is **GRANTED IN PART AND DENIED IN PART**. The Wheeler Defendants are not entitled to a *Franks*

hearing, nor to suppression of evidence seized during the execution of the warrants or during

the traffic stops. However, any statements that Stephen Wheeler made after invoking his right

to counsel in the post-arrest interview on February 7, 2023, must be suppressed.

      **IT IS SO ORDERED.**

April 5, 2024

Jeffery P. Hopkins
United States District Judge